670 F.2d 493
 68 A.L.R.Fed. 318, 1984 A.M.C. 1216
 Trevor E. LOOSE, Plaintiff-Appellee,
v.
OFFSHORE NAVIGATION, INC., Defendant,
Vince GUZZETTA d/b/a Guzzetta Offshore Marine Service, Inc.,
Defendant-Appellee,
v.
PETTY RAY GEOPHYSICAL CO., a Division of Geosource, Inc.,
Defendant-Third PartyPlaintiff-Appellant,
v.
INTERNATIONAL OFFSHORE NAVIGATION and Midnight Boat
Corporation, Third-PartyDefendants-Appellees.
Trevor E. LOOSE, Plaintiff-Appellee,
v.
OFFSHORE NAVIGATION, INC., Defendant,
Petty Ray Geophysical Co., a Division of Geosource, Inc.,
Defendant-Third PartyDefendant-Appellant,
International Offshore Navigation and Midnight Boat Corp.,
Third-PartyPlaintiffs-Appellees.
 Nos. 79-3460, 80-3094.
 United States Court of Appeals,
Fifth Circuit.
 March 4, 1982.
 
 Ralph E. Smith, New Orleans, La., for defendant-third party defendant-appellant in both cases.
 Birdsall, Alvarez & Rodriguez, Benjamin J. Birdsall, Jr., Lawrence J. McGrath, II, New Orleans, La., for Loose.
 Michael J. Maginnis, McGlinchey, Stafford, Mintz & Hoffman, New Orleans, La., for Guzzetta, Intern. Offshore Navigation and Midnight Boat Corp.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GEE and RUBIN, Circuit Judges, and SPEARS*, District Judge.
 ALVIN B. RUBIN, Circuit Judge:
 
 
 1
 The jury verdict obtained by a Jones Act seaman for personal injuries resulting from what the jury considered the negligence of his employer and unseaworthiness of the vessel aboard which he was employed must be set aside because the seaman's lawyer invoked the "Golden Rule" in his jury argument. Who among the several defendants, his employer, the vessel owner, the vessel operator, bears responsibility must also be reconsidered because the interrogatories submitted to the jury on the issues of indemnity did not apply the doctrine of comparative fault.
 
 
 2
 Trevor Loose, an Australian citizen employed by Offshore Navigation as a mobile electronics operator, was disembarking from the Deep Sea Explorer when he fell off the gangplank. He seeks to recover for injuries to his arm and shoulder, basing his claims on negligence and the unseaworthiness of the vessel.
 
 
 3
 Offshore Navigation and its subsidiary, International Offshore Navigation (International Offshore), provide precise electronic navigational services for underwater seismic operations by means of an electronic location system called Shoran. International Offshore contracted with Geosource, of which Petty Ray Geophysical (Petty Ray) is a division, to conduct seismographic studies in the Eastern Caribbean, off the Coast of Nicaragua. Offshore Navigation was to guide placement of the seismograph with its Shoran system. Petty Ray chartered the Deep Sea Explorer from Guzzetta Offshore Marine Service, Inc. (Guzzetta Offshore), under an instrument that was, in title and content, a typical bareboat charter. For reasons that do not appear in the record, Petty Ray then entered into an agreement with Midnight Boat Corporation (Midnight Boat) to furnish a crew to operate the vessel. Midnight Boat and Guzzetta Offshore are both corporations owned by the Guzzetta family. The vessel was to transport the Petty Ray team and its seismographic equipment as well as Offshore Navigation's Shoran crew, which included Loose.
 
 
 4
 The master of the vessel, a Midnight Boat employee, was solely responsible for the navigation of the vessel and the direction of its crew. He had no authority, however, over the seismographic work, which was performed entirely by Petty Ray personnel under the direction of Scott Hunt, a Petty Ray employee, or over the Shoran operation, which was performed by Offshore Navigation's crew.
 
 
 5
 Loose filed suit against his employer, Offshore Navigation, for negligence under the Jones Act; against Guzzetta Offshore, the vessel owner, for negligence under general maritime law; and against Petty Ray, the vessel's bareboat charterer, for negligence under general maritime law.[1] Loose also alleged that the Deep Sea Explorer was unseaworthy, but the complaint does not clearly assert either the nature of the unseaworthiness or which party was to be held responsible for it. Petty Ray in turn filed a third-party complaint against International Offshore, which had agreed to indemnify it, and against Midnight Boat, which had supplied the crew for the vessel. Finally, each defendant filed cross-claims against all the other defendants for indemnity, including attorney's fees and costs of defense. Shortly before trial, summary judgment was granted against Loose in favor of Offshore Navigation and International Offshore.
 
 
 6
 There was evidence that the aluminum gangplank from which Loose fell was owned by Petty Ray and had been put aboard the vessel for the use of its employees in embarking and disembarking because of the lack of wharf facilities at Puerto Cabezas, Nicaragua. Petty Ray, however, disputes this and contends that the gangplank was part of the ship's gear.
 
 
 7
 The jury returned a verdict for Loose in the amount of.$61,500. It found that Petty Ray was actively negligent, contributing 50% to Loose's injuries, Midnight Boat was passively negligent, contributing 25%, the Deep Sea Explorer was unseaworthy, contributing 25% to Loose's injuries, and Guzzetta Offshore was not negligent. The district judge interpreted this verdict as absolving all defendants except Petty Ray. He awarded attorney's fees and costs to Guzzetta Offshore, Midnight Boat, Offshore Navigation, and International Offshore as the indemnity due them. We first consider Petty Ray's claim that it is entitled to a new trial.
 
 I.
 
 8
 What every lawyer should know is that a plea to the jury that they "should put themselves in the shoes of the plaintiff and do unto him as they would have done unto them under similar circumstances .... (is) improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." Ivy v. Security Barge Lines, Inc., 585 F.2d 732, 741 (5th Cir. 1978) (footnote omitted), rev'd on other grounds, 606 F.2d 524 (5th Cir. 1979) (en banc) (panel opinion reinstated as to matters not discussed in en banc opinion), cert. denied, 446 U.S. 956, 100 S.Ct. 2927, 64 L.Ed.2d 815 (1980).[2] The use of such a "Golden Rule" argument so taints a verdict as to be grounds for a new trial. See, e.g., Ivy v. Security Barge, 585 F.2d at 741.
 
 
 9
 Loose's counsel did not, in closing argument, directly beseech the jury to do unto Loose as they would be done by,[3] but did so by preterition, saying:
 
 
 10
 I told you originally that the suit was for $250,000.00. You may think that's too much. I don't want to ask you to place yourself in Mr. Loose's position, having to work and live the rest of his life with that, the loss of that, that elbow, or that radial head, and I'm certainly not going to ask you to put yourself up 50 feet high with one good arm.
 
 
 11
 Loose replies that this negative statement is sufficiently different from direct invocation of the Golden Rule to escape condemnation. This distinction lacks substance. When counsel stated that he would not ask the jurors to put themselves in the plaintiff's position, his argument had precisely the same effect as if he had urged them to do so; this was an invitation to the jurors to render unto Loose what they would like to have if they were in his condition, and an effort to influence them to decide the case on the basis of sympathy and bias rather than an objective view of the evidence.
 
 
 12
 Petty Ray did not waive its right to appeal this argument by failing to object to it when it was made. The co-defendants did object. An objection to the argument was promptly made by the lawyer appearing as counsel for Guzzetta, Midnight Boat and Guzzetta Offshore and was immediately overruled by the magistrate who was, at the request of the district judge, and with the consent of counsel for all parties, presiding at the final arguments and was to give the jury charge so that the trial judge could fulfill another commitment. See 28 U.S.C. § 636(c)(1) (West Supp.1981). So far as the record discloses, counsel for Petty Ray said nothing. Counsel for Loose said, "Thank you, Your Honor," and proceeded with the rest of his argument.
 
 
 13
 "(W)hen one party has made an objection or offer of proof, it should be presumed, unless the contrary appears, that co-parties aligned with him have joined in the objection or offer." Howard v. Gonzales, 658 F.2d 352, 355 (5th Cir. 1981). The Howard court based its conclusion on the fact that the "literal wording of (Fed.R.Evid.) 103(a) does not require that the objection or the offer of proof be made by the party seeking to raise the point on appeal." 658 F.2d at 355. The purpose of a timely objection is to call a matter to the attention of the court and opposing counsel so that prejudice can be corrected at once, and a new trial averted. E.g., Jenkins v. General Motors Corp., 446 F.2d 377, 383 (5th Cir. 1971), cert. denied, 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972); Colonial Refrigerated Transp., Inc. v. Mitchell, 403 F.2d 541, 552 (5th Cir. 1968); see Fed.R.Civ.P. 46. Therefore, when one party objects and thereby brings the issue to the court's attention, further objections by co-parties are unnecessary. See United States v. Brown, 562 F.2d 1144, 1147 n.1 (9th Cir. 1977); United States v. Love, 472 F.2d 490, 496 (5th Cir. 1973); United States v. Lefkowitz, 284 F.2d 310, 313 n.1 (2d Cir. 1960). Indeed, it would seem both dilatory and fatuous for each of the parties to stand in turn and voice its "me-too."
 
 
 14
 The invocation of the Golden Rule does not create immutable error. The trial judge may, by appropriate instruction, salve the suit. Here, however, the magistrate presiding in place of the trial judge overruled the objection. He not only failed to take corrective action, as was done in Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705, 713-15 (5th Cir. 1967), but, in effect, gave his imprimatur to the language used.
 
 II.
 
 15
 Petty Ray also contends that it should not be held responsible for the seaworthiness of the Deep Sea Explorer. Determination of this issue is rendered more difficult by the ambiguity of the record, for it is not clear whether Loose made a claim for unseaworthiness, and if so, whether the claim was asserted against Petty Ray alone or both Petty Ray and Guzzetta Offshore.[4] Whether Guzzetta Offshore was responsible for the vessel's unseaworthiness, either directly to the plaintiff or to Petty Ray, which had cross claimed against Guzzetta Offshore, was not submitted to the jury, and we are unable to determine from the record whether the district judge thought that Loose's complaint failed to assert that Guzzetta Offshore was responsible for unseaworthiness or whether he considered the evidence insufficient to support a verdict and inferentially directed one. Therefore, even though the jury verdict absolved Guzzetta Offshore of any negligence under general maritime law, on remand the district court shall consider whether, under the pleadings as they may have been amended, Loose should be permitted to pursue an unseaworthiness claim against Guzzetta Offshore in addition to the unseaworthiness claim against Petty Ray.
 
 
 16
 Petty Ray argues that, even if unseaworthiness has been properly alleged, it is not responsible for that condition because it was not a bareboat charterer of the vessel.[5] In title and content the agreement between Guzzetta Offshore and Petty Ray was a bareboat charter. The premise of Petty Ray's argument, however, is that Petty Ray did not have sufficient control over the vessel to be a bareboat charterer[6] because the operating agreement between Petty Ray and Midnight Boat gave the captain of the vessel, a Midnight Boat employee, sole responsibility for its navigation,[7] and both Midnight Boat and Guzzetta Offshore are closely held corporations owned by the Guzzetta family.[8]
 
 
 17
 The district judge stated his understanding of the issue to be that Petty Ray was trying to pierce the corporate veil of Guzzetta Offshore and Midnight Boat to show that the owner of the vessel in reality retained control of navigation. At no point did the parties discuss Petty Ray's admission in the pretrial order, now stressed by Midnight Boat on appeal, that "(a)t all material times, Petty Ray Geophysical, a division of Geosource, was the bareboat charterer of the M/V Deep Sea Explorer off the coast of Nicaragua." (Emphasis supplied.) Such an admission is usually a waiver of the assertion of a contrary position, see Myers v. Manchester Ins. & Indemnity Co., 572 F.2d 134 (5th Cir. 1978); Mull v. Ford Motor Co., 368 F.2d 713, 716 (2d Cir. 1966). Midnight Boat did not raise the stipulation in the court below as a bar to this contention, however, and, in view of the murky condition of the record, we pretermit a ruling on whether this failure now forecloses the argument. Instead, we leave the issue of the nature of the contractual agreement open for full consideration by the district court, and remand for proceedings consistent with our decisions in Baker v. Raymond Int'l Co., 656 F.2d 173 (5th Cir. 1981) and Agrico Chem. Co. v. M/V Ben W. Martin, 664 F.2d 85 (5th Cir. 1981).
 
 III.
 
 18
 Finally, Petty Ray contends that the application of the active-passive negligence concept through which Petty Ray, found by the jury to be an active tortfeasor, is asserted to owe indemnification to Midnight Boat, found by the jury to be a passive tortfeasor, was improper because the jury also found that the vessel was unseaworthy and that Midnight Boat's negligence contributed 25% to Loose's injuries. The jury interrogatories asked if each of the defendants, Guzzetta Offshore, Petty Ray, and Midnight Boat, was responsible for any negligence that was the proximate cause of the plaintiff's injuries, and, if so, whether that negligence was active or passive. The jury found that Petty Ray and Midnight Boat were negligent, but that only Petty Ray's negligence was active. The jury found that the vessel's unseaworthiness was also a proximate cause of Loose's injuries. In addition, the jury, in response to a direction to list the percentage each of the following factors contributed to the plaintiff's injuries, found:
 
 
 19
 Factors Jury's Response
 ------- ---------------
The negligence of
defendant Guzzetta None
The negligence of
defendant Petty Ray 50%
The negligence of third-party
defendant Midnight Boat 25%
The unseaworthiness of the
M/V DEEP SEA EXPLORER 25%
The negligence of the plaintiff None
 
 
 20
 The district judge rendered judgment in favor of Loose and against Petty Ray, and, on the cross-claims and third-party claims, in favor of Guzzetta Offshore and Midnight Boat. Thus, Petty Ray was held liable to Loose for the entire amount of damages awarded by the jury.
 
 
 21
 The attorney for Petty Ray objected to the jury interrogatories in a written objection: "Would request clarification of active or passive negligence, or in the alternative to eliminate the charge." In a conference regarding the proposed jury instructions, the district judge noted that the objection offered by the attorney for Petty Ray touched "upon a very sensitive subject, and that is the inability of the judges of the Fifth Circuit ... to clearly define these active-passive terms and their role in cases like this." The judge indicated that he would be open to suggestions for improvement, but the attorney for Petty Ray remarked that in "(e)very other case I've ever been in, the Judge says, 'we don't want to leave that to the Jury. I'll handle that.' "
 
 
 22
 The instructions ultimately delivered to the jury were:
 
 
 23
 Each Defendant claims that if it was negligent, this negligence was passive, not active. In order for someone's negligence to be active, it must be characterized by some affirmative act. A person is only passively negligent if he fails to do something he should have done. When two or more Defendants are found to be liable to a Plaintiff, and one Defendant was only passively negligent and the other Defendants were actively negligent, that Defendant who is only passively negligent is entitled to indemnification.
 
 
 24
 If indemnity does not apply, you must consider the question of contribution. Where two or more Defendants are negligent or otherwise at fault, and this fault contributes to causing an injury, each of the Defendants becomes responsible for paying a portion of the damages.
 
 
 25
 If you find that indemnity does not apply, but the accident was due partly to the fault of each of two or more of the Defendants, you should indicate these degrees of fault on the special interrogatories on which you shall write your verdict.
 
 
 26
 This circuit has frequently stated the principle that a tortfeasor who is only passively negligent should be indemnified by any actively negligent tortfeasors.[9] However, in applying the rule thus broadly phrased, we have narrowly defined the concept of passive negligence,[10] restricting it to situations in which the so-called "passive" tortfeasor was merely vicariously liable for the torts of another and those in which the liability was imposed on him for some other technical reason unrelated to personal fault. In such instances, the principle applied is basically one of restitution.[11] When each tortfeasor is guilty of acts or omissions that could have proximately caused the injury complained of, we have refused to consider the mere inaction of a party to be passive negligence.[12] In any event, the active-passive rubric is merely a method of liability-shifting: either the tortfeasors bear the loss in equal shares or one bears all of it.
 
 
 27
 In United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Supreme Court held that another liability-shifting rule, the admiralty rule of divided damages in collision cases[13] should be replaced by a rule requiring, when possible, the allocation of liability for damages in proportion to the relative fault of each party. This principle of fault allocation is not limited to maritime collision cases. Thus, in Gator Marine Serv. Towing, Inc. v. J. Ray McDermott & Co., 651 F.2d 1096, 1100 (5th Cir. 1981), we held that Ryan indemnity principles should not be extended to "disputes between a vessel and her stevedore over vessel and cargo damage" because such disputes "are best accommodated by a straightforward application of the usual maritime comparative fault system." Similarly, in Harrison v. Flota Mercante Grancolombiana, S.A., 577 F.2d 968, 981-82 (5th Cir. 1978), we held, based on Reliable Transfer, that, if liability is imposed against any party, "the court should consider the concept of proportionate fault." In Leger v. Drilling Well Control, Inc., 592 F.2d 1246, 1248 (5th Cir. 1979), we found the Reliable Transfer comparative fault principles persuasive in noncollision personal injury cases as well and held that "liability for such damages is to be allocated among the parties proportionately to the comparative degree of their fault."
 
 
 28
 The introduction of the rule of comparative fault to maritime torts requires reconsideration of the active-passive negligence doctrine.[14] The common law courts were at first unwilling "to make relative value judgments of degrees of culpability among wrongdoers."[15] The principle that an actively negligent tortfeasor should be required to indemnify a tortfeasor only passively negligent was developed to alleviate the harsh rule that prohibited apportionment among tortfeasors.[16] In a sense, then, the indemnity rule was a precursor of modern systems of comparative fault because it attempted to transfer ultimate legal liability to the defendant truly in the wrong. Comparative fault seeks the same objective both more persuasively and more accurately. A comparative fault system not only eliminates the doctrine of contributory negligence but also apportions fault among joint tortfeasors in accordance with a precise determination, not merely equally or all-or-none.[17]
 
 
 29
 It is difficult to see the need for the active-passive indemnification rule ina comparative fault system.[18] While the active-passive concept is more equitable than strict nonapportionment, there have never been satisfactory distinctions between the definition of "active" and "passive."[19] The district court in this case did not attempt to define these terms, but left it to the jury to define them from their everyday significance. As the district judge pointed out, however, it would have been difficult on the authority of decided cases to phrase a charge that would have been instructive and clear. There is, therefore, all the more reason to determine the degree of responsibility of each tortfeasor on the facts as presented at trial, and then to apportion damages among the tortfeasors on that basis.[20] Leger has already extended the Reliable Transfer concept of proportionate fault to maritime personal injury cases. We reaffirm that extension and emphasize what other courts and commentators have said before us: the concepts of active and passive negligence have no place in a liability system that considers the facts of each case and assesses and apportions damages among joint tortfeasors according to the degree of responsibility of each party. Therefore, we direct the trial judge on remand to eliminate any instructions or interrogatories relating to active and passive negligence, and instead instruct the jury to assess the relative degree of responsibility of each party for the plaintiff's injuries.
 
 
 30
 For these reasons, the judgment is REVERSED. The case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 District Judge of the Western District of Texas, sitting by designation
 
 
 [1]
 Loose also sued Zapata Off-Shore Company, but voluntarily dismissed his claim against Zapata before trial
 
 
 [2]
 Accord, Burrage v. Harrell, 537 F.2d 837, 839 (5th Cir. 1976) ("golden rule" cases "deal with arguments in which the jury is exhorted to place itself in a party's shoes with respect to damages") (emphasis omitted); Har-Pen Truck Lines, Inc. v. Mills, 378 F.2d 705, 714 (5th Cir. 1967) ("The real danger (of the Golden Rule argument) is that the sympathy and feelings of the jury will be encouraged and aroused so that the jury will decide the case and award damages out of relation to actual fault and actual damage.")
 
 
 [3]
 "Therefore, all things whatsoever ye would that men should do to you, do ye even so to them: for this is the law of the prophets." Matthew 7:12. Accord, Luke 6:31
 
 
 [4]
 Loose's complaint contained the caption, "Claim for damages under the Jones Act, claim for unseaworthiness and for maintenance and cure." (Emphasis supplied.) Among the defendants named in the complaint were Petty Ray and Guzzetta Offshore. The complaint stated, however, only that "the injuries were directly caused by the negligence of the defendants ... in failing to provide your Petitioner with a safe place in which to work, in failing to promulgate and enforce proper and safe rules of seamanship."
 At least some of the defendants apparently understood that unseaworthiness was an issue, for Offshore Navigation in its interrogatories to Loose inquired in detail about the "precise manner in which each vessel was unseaworthy." Another defendant, Zapata Off-Shore, now no longer a party, made a similar inquiry. In its third party complaint, Petty Ray sought recovery against other parties "if the M/V Deep Sea Explorer is found to have been a proximate cause of the accident." Likewise the Joint Cross Claim of Guzzetta Offshore and Midnight Boat seeks recovery against Petty Ray "in the event that the M/V Deep Sea Explorer should be found unseaworthy and that such unseaworthiness was (the) proximate or legal cause of plaintiff's alleged injuries."
 In the pretrial order, the plaintiff stated among its contentions, that "jurisdiction is conferred ... under the General Maritime Law, including the warranty of seaworthiness." The order listed as a contested issue of fact "the unseaworthiness of the vessel." At the trial the evidence indicated that Petty Ray was being charged with the vessel's unseaworthiness. In consequence, at a conference regarding the proposed jury instructions held during the course of the trial, Petty Ray argued to the court that the complaint stated an unseaworthiness claim against Guzzetta Offshore as well as against Petty Ray. Yet, at the close of the plaintiff's case, the attorney for Petty Ray moved to dismiss the complaint against Petty Ray on the ground that the complaint did not set forth a claim of unseaworthiness. This motion was denied. The attorney who represented Guzzetta Offshore and Midnight Boat then moved for a directed verdict on the unseaworthiness claim "on the grounds that the vessel, the Deep Sea Explorer was bareboat chartered to Petty-Ray Geophysical at the time of the plaintiff's accident." The second motion was also denied.
 Finally, after all the evidence had been presented, Petty Ray requested that the jury instruction on unseaworthiness be withdrawn because the "original complaint ... contains no allegations of unseaworthiness against any of the Defendants." The attorney representing Loose replied that he thought the complaint had alleged unseaworthiness, but would, in any event, "ask leave of Court to amend the original pleadings in order to allege unseaworthiness in order to conform with the evidence." The court allowed the amendment but, without giving any reasons, limited the claim of unseaworthiness to Petty Ray. The record contains nothing that would assist us in determining whether this ruling was predicated on Loose's failure to assert an unseaworthiness charge against Guzzetta in his complaint and, if so, why the allegations were sufficient to implicate Petty Ray. Moreover, we are unable to determine why, if the amendment was necessary, it was allowed as to one defendant but not another.
 
 
 [5]
 "A bareboat or demise charter ... constitutes the only form of charter that purports to invest temporary powers of ownership in the charterer and, therefore, constitutes the only conceivable basis on which the vessel owner could seek to escape liability for the unseaworthiness of his vessel." Baker v. Raymond Int'l Co., 656 F.2d 173, 182 (5th Cir. 1981) (footnote omitted)
 
 
 [6]
 "To create a demise, the owner of a vessel must completely and exclusively relinquish 'possession, command and navigation' thereof to the demisee." Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 207 (1962)
 
 
 [7]
 The operating agreement provided that: "The charterer through its representative shall advise the captain as to the general location where it wants the vessel taken; provided, however, the captain shall be solely responsible for navigating the vessel." (Emphasis supplied.)
 
 
 [8]
 We look through the form of the transaction to its substance to determine whether an agreement for the use of a vessel constitutes a bareboat charter or some other relationship. Agrico Chem. Co. v. M/V Ben W. Martin, 664 F.2d 85, 91-92 (5th Cir. 1981)
 
 
 [9]
 E.g., Cotten v. Two "R" Drilling Co., 508 F.2d 669, 671 (5th Cir. 1975); Kelloch v. S & H Subwater Salvage, Inc., 473 F.2d 767, 769 (5th Cir. 1973) ("The passively negligent tortfeasor is clearly entitled to total indemnity from the actively negligent party."); Tri-State Oil Tool Indus., Inc. v. Delta Marine Drilling Co., 410 F.2d 178, 181 (5th Cir. 1969) ("the right of indemnity exists between parties, one of whom is guilty of active or affirmative negligence, while the other's fault is only technical or passive"). See generally W. Prosser, Handbook of the Law of Torts § 51, at 312 (4th ed. 1971)
 
 
 [10]
 See, e.g., Culver v. Slater Boat Co., 644 F.2d 460, 466 (5th Cir.), rehearing en banc granted, 644 F.2d 466 (1981) ("Where a tortfeasor's own acts and omissions help create the unsafe workplace, its negligence undoubtedly is active."); Wedlock v. Gulf Miss. Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977) ("Indeed, the classic case of passive negligence occurs only when one joint tortfeasor creates a danger that the other (passive) tortfeasor merely fails to discover or to remedy."); Avondale Shipyards, Inc. v. Vessel Thomas E. Cuffe, 434 F.Supp. 920, 928 (E.D.La.1977) (a party is passively negligent if it "breach(es) an absolute duty to provide a seaworthy vessel or (is) liable under a rule imposing vicarious or technical liability")
 
 
 [11]
 "The basis for indemnity is restitution, and the concept that one person is unjustly enriched at the expense of another when the other discharges liability that it should be his responsibility to pay." Restatement (Second) of Torts § 886B comment c (1977). Accord, 2 G. Palmer, The Law of Restitution § 10.6, at 410-11 (1978)
 
 
 [12]
 E.g., Christofferson v. Halliburton Co., 617 F.2d 403 (5th Cir.), on petition for rehearing, 617 F.2d 408 (5th Cir. 1980) (the active-passive indemnity rule does not apply if the party's negligence contributed to the accident); Wedlock v. Gulf Miss. Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977) ("The passive negligence doctrine has been held inapplicable where the would-be indemnitee is guilty of acts or omissions that could have proximately caused the injury complained of."); Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684, 693 (5th Cir.), cert. denied, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970); Avondale Shipyards, Inc. v. Vessel Thomas E. Cuffe, 434 F.Supp. 920, 928 (E.D.La.1977) (Rubin, J.)
 
 
 [13]
 "Prior to 1975, damages in maritime collision cases where both parties were at fault were divided equally or were placed completely on one party in some cases under the 'major/minor' fault rule." Gorman, Ryan Indemnity in Maritime Property Damage Cases: What of Proportionate Fault? 8 U.Balt.L.Rev. 42, 56 (1978)
 
 
 [14]
 H. Woods, Comparative Fault § 13:11, at 238 (1978), states:
 In the cases where negligence of one defendant is denominated as active and the other passive, or where the defendants are not in pari delicto, it is submitted that contribution and not indemnity should be the rule. This is particularly true in those comparative negligence jurisdictions where there is a proportionate assessment of fault among the defendants.... Contribution is the remedy and not indemnity where a defendant claim(s) indemnity based on the passive-active negligence concept.
 Accord, V. Schwartz, Comparative Negligence § 16.9, at 272 (1974) ("In comparative negligence states that permit contribution, it is likely that this principle (permitting indemnity to a passive joint tortfeasor from an active one) will be curbed."); Gorman, Indemnity and Contribution Under Maritime Law, 55 Tul.L.Rev. 1165, 1199 (1981) ("Where the parties have not expressly agreed on how to allocate the loss, the courts should apply contribution among tortfeasors based upon principles of comparative fault.").
 Courts have also recognized the inconsistency between active-passive indemnity and comparative fault. See, e.g., Griffith v. Wheeling-Pittsburgh Steel Corp., 610 F.2d 116, 129 (3d Cir. 1979), vacated on other grounds, 451 U.S. 965, 101 S.Ct. 2038, 68 L.Ed.2d 343 (1981) (the active-passive indemnity rule relieves a passively negligent tortfeasor "from any liability for the damage that occurred. That result seems strongly at odds with the preferences for comparative fault expressed in Reliable Transfer "); Missouri Pac. R.R. Co. v. Star City Gravel Co., 592 F.2d 455, 458 n.3 (8th Cir. 1979) (the court noted the district court's prediction that Arkansas state courts would reject indemnity "in favor of a universal application of its contribution and comparative fault statutes"); Kennedy v. City of Sawyer, 228 Kan. 439, 452, 618 P.2d 788, 798 (Sup.Ct.1980) (the adoption of comparative negligence in Kansas has abrogated the active-passive negligence indemnity rule).
 
 
 [15]
 Dole v. Dow Chem. Co., 30 N.Y.2d 143, 148, 282 N.E.2d 288, 291, 331 N.Y.S.2d 382, 386 (1972). Accord, Restatement (Second) of Torts § 886A comment a (1977) ("For a long time the great majority of the American jurisdictions adopted a fixed rule that there could be no contribution between those who were liable in tort for the same harm, even when it was negligently inflicted.")
 
 
 [16]
 Dole v. Dow Chem. Co., 30 N.Y.2d 143, 148-49, 282 N.E.2d 288, 291-92, 331 N.Y.S.2d 382, 386-87 (1972); V. Schwartz, supra note 14, at 272 ("The general principle permitting indemnity to a passive joint tortfeasor from an active one was applied by courts in new and other contexts, probably because of the harshness of the 'no contribution among joint tortfeasors' rule.")
 The law of indemnity developed at an earlier time when contribution was not available. Its all-or-nothing remedy was thus the only relief available to a joint tortfeasor who had paid the full amount of the injury. Courts therefore were inclined to be ready to expand the list of situations in which indemnity might be granted. The list has come to include many situations in which the indemnitee was definitely at fault but not to as great an extent as the indemnitor-so that a decision between all and nothing would be made for all rather than nothing.
 With the advent and free availability of contribution, the nature of the problem has changed and the courts may have the opportunity of apportioning the financial responsibility between the parties. This may produce a gradual expansion of the situations covered by contribution, at the expense of indemnity. Indeed, in the growing number of jurisdictions that determine the equitable shares of the obligation for contribution on the basis of the comparative fault of the parties, it may well develop that the two remedies will merge into each other, and that proportionate contribution will be determined by the factfinder in accordance with the relative percentages of fault for the several parties. (See § 886A, Comment 1). This would eliminate the occasion for some of the highly technical decisions that have been rendered in actions for indemnity.
 Restatement (Second) of Torts § 886B comment 1 (1977).
 
 
 [17]
 Two methods of apportioning damages have been recognized: pro-rata contribution and contribution based on the comparative fault of the tortfeasors. Restatement (Second) of Torts § 886A comment h (1977). The latter method "seems fairer and more equitable .... It fits particularly in a state that has adopted the rule of comparative negligence and is, indeed, almost required for the effective administration of that rule, so that the negligence of the plaintiff can also be apportioned into the total amount of negligence of the parties." Id. We hold that contribution based on the comparative fault of the tortfeasors must be used in apportioning fault in maritime cases, rather than pro-rata contribution
 
 
 [18]
 Both contractual indemnity and implied indemnity or contribution continue to supplement comparative negligence allocation
 As to contractual provisions, see Gorman, supra, note 14, at 1196 ("Indemnity rights should be limited to situations where an express agreement so provides."). In this case, the contractual indemnity provisions were not argued to us on appeal.
 The charter agreement between Guzzetta and Petty Ray provides:
 (Petty Ray) agrees to indemnify and hold harmless (Guzzetta Offshore) of and from any and all claims, demands or causes of action arising out of or in any way connected with damage or injury to any of the (Petty Ray's) property or personnel.
 The operating agreement between Midnight Boat and Petty Ray contains the following provision:
 (Petty Ray) agrees to indemnify and hold harmless (Midnight Boat) of and from any and all claims, demands or causes of action arising out of or in any way connected with damage or injury to any of (Petty Ray's) property or personnel.
 The contract between Petty Ray and International Offshore provides:
 International Offshore agrees to protect, indemnify and save (Petty Ray) harmless from and against all claims, demands, and causes of action of every kind and character arising in favor of International Offshore or its employees on account of personal injuries, death or property damage sustained or incurred by (International Offshore) or its employees.
 However, International Offshore and its parent, Offshore Navigation, have been dismissed from this suit.
 Indemnity based on vicarious liability is also available in a comparative fault system. Victor Schwartz gives an example: "When negligence is apportioned in the presence of vicarious liability, the master bears the burden of his servant's negligence. If the master has been partially at fault, the percentage of negligence attributed to the servant is added to the percentage attributed to the master." V. Schwartz, supra note 14, § 16.1, at 248-49 (footnotes omitted).
 
 
 [19]
 Pachowitz v. Milwaukee & Suburban Transp. Corp., 56 Wis.2d 383, 387, 202 N.W.2d 268, 271 (Sup.Ct.1972) (the court noted that the dividing line between "active" and "passive" negligence was blurred); see W. Prosser, supra note 9, § 51, at 313 ("it is extremely difficult to state any general rule or principle as to when indemnity will be allowed and when it will not")
 
 
 [20]
 Dole v. Dow Chem. Co., 30 N.Y.2d 143, 148-49, 282 N.E.2d 288, 291-92, 331 N.Y.S.2d 382, 391-92 (1972); Lipson v. Gewirtz, 70 Misc.2d 599, 334 N.Y.S.2d 662 (1972)